20

$\mathcal{LE}$

1

1    UNITED STATES DISTRICT COURT
2    EASTERN DISTRICT OF NEW YORK
3    ------------------------------------------X
4    BRIAN COLELLA,

                        Plaintiff
5
                                            CASE NO.:
6                                           09-CU-5258
                                            (ARR) (LB)
7              -against-

8

9    THE NEW YORK CITY FIRE DEPARTMENT, THE CITY
     of NEW YORK and DOMINICK MORETTI,
10

11                      Defendants

12   ------------------------------------------X

                                    100 Church Street
13                                  New York, New York

14                                  January 31, 2011
                                    10:00 A.M.
15

16

17

18        EXAMINATION BEFORE TRIAL of DOMINICK MORETTI, one

19   of the Defendants herein, taken by the attorney for the

20   Plaintiff pursuant to Notice and held at the above

21   stated time and place before Joseph J. Pontillo, a

22   Notary Public of the State of New York.

23                      ----------

24                                   ORIGINAL
25

28

DOMINICK MORETTI

1

2     A     I'm retired.

3     Q     When did you retire?

4     A     March 31st, 2009.

5     Q     Was your retirement voluntary?

6     A     Yes.

7     Q     What was the last position you held before

8  you retired?

9     A     Electrical supervisor.

10    Q     That was with the Division of Building

11 Maintenance for the Fire Department, correct?

12    A     Yes.

13    Q     For how long were you an electrician

14 supervisor?

15    A     Maybe since 1983.

16    Q     How long were you electrician supervisor at

17 the Fire Department?

18    A     Well, I got there July 28th, 2001.

19    Q     Can you briefly describe your educational

20 background?

21    A     I have an associates degree.

22    Q     In what field?

23    A     Labor studies.

24    Q     Do you hold any licenses?

25    A     No, except a driver's license.

31

DOMINICK MORETTI

1

2      Q      What was the reason you left your position at

3    Health and Hospitals?

4      A      Other opportunities.

5      Q      You were not terminated from your position?

6      A      No.

7      Q      Sir, do you recall ever being investigated by

8    the Office of the Inspector General in connection with

9    a number of allegations while you were employed at

10   Coney Island Hospital?  Those included the following

11   substantiated allegations against you, "Mr. Moretti

12   allowed excessive non HHC business to be conducted by

13   subordinates using HHC time and materials.

14            Mr. Moretti allowed and approved

15   falsification of HHC time records.

16            Mr. Moretti lied about his New York City

17   residency needed for his employment and submitted a

18   false declaration of New York City residency.

19            Mr. Moretti failed to report a harassment and

20   retaliation against employees.

21            Mr. Moretti sought to place illegal wiretaps

22   on another employee's HHC telephone."

23            MS. WELCH:  Objection to the form.

24      A      I don't recall anything like that.

25            MS. KOUSOULAS:  Can I have this marked

32

```
1                    DOMINICK MORETTI

2        as Plaintiff's Exhibit 3.  It's a document

3        Bates stamped BC00594 through BC00601.

4            (Whereupon, a Health and Hospitals

5        Corporation notice was marked as Plaintiff's

6        Exhibit 3 for identification, as of this

7        date.)

8            MS. WELCH:  This is Bates stamped.

9            MS. KOUSOULAS:  Yes.

10   Q     Take a look at the document.

11           MS. KOUSOULAS:  This is a notice,

12       confidential, Office of Inspector General,

13       New York City Health and Hospitals Corporation.

14       It's specifically the substantiated

15       allegations.  It's Bates stamp BC00601.  It

16       has the following recommendations: OIG

17       recommends that the employment of Nagisar

18       Ramgalli, Dominick Moretti and Aziah

19       Mullchan be terminated for various violations

20       of HCC rules and regulations.

21   Q     You testified earlier about a complaint being

22   brought by Harvey Mandell, correct?

23   A     Yes.

24   Q     Was there a time, sir, when you were actually

25   terminated from HHC?
```

39

1                    DOMINICK MORETTI

2      Q     Was Mr. Colella the only party in the action?

3      A     There might be others.  I think there were

4   others.

5      Q     Wasn't this a claim where the individuals

6   were claiming that they didn't get paid overtime for

7   certain times with regard to driving their vehicles?

8   I'm trying to be as vague as possible.

9      A     Maybe you can be more specific.  Overtime is

10  only authorized when it was given.  If anyone did

11  overtime and didn't inform us, then it was not

12  authorized.

13     Q     I'm not asking that.  Did you testify at the

14  proceeding, at the deposition?

15     A     Well, I did testify.

16     Q     That's all I want to know.  What were your

17  duties and responsibilities as the electrical

18  supervisor for the Fire Department?  If it changed from

19  2001 until your retirement in 2009, please indicate

20  that.

21     A     Requisition materials, layout and instruct

22  employees, electricians, the job.

23     Q     Lay out jobs?

24     A     Yes, lay out jobs.  Keep time records, work

25  records of where they were going.  Go to meetings

40

```
1                    DOMINICK MORETTI
2    regarding any electrical work with all divisions of the
3    Fire Department.  Hand out the paychecks.  Call the
4    vendors for pricing of materials.  Inventory.
5         Q    You reported directly, I believe you said, to
6    Mr. Young?
7         A    Yes.
8         Q    Then Mr. Wallen?
9         A    Yes.
10        Q    Who was their superior?
11        A    Joe Mastropietro.
12        Q    Did you interact directly with Mr.
13   Mastropietro, as well, at times?
14        A    Yes.
15        Q    With regard to the timekeeping, what exactly
16   were your duties and responsibilities with regard to
17   that?  Did you review time sheets?
18        A    Yes.
19        Q    Were you responsible for approving or
20   disapproving certain items that were on the time
21   sheets?  In other words, if someone, for example, had
22   put in for overtime that wasn't authorized, would you
23   be the one to say I'm questioning that?
24        A    I would bring it to my superior and then we
25   would do that.
```

1                         DOMINICK MORETTI

2          Q     Were you responsible for assigning overtime

3     to the individuals that reported to you?

4          A     Yes.

5          Q     There were two types of overtime, correct?

6     There was the mandatory overtime and then there was

7     overtime where you could direct someone to do overtime,

8     or did you always have to do that?

9          A     Only with authorization to do that.

10         Q     You were the one that had the power to do

11    that, to direct that, to give overtime?

12         A     No.

13         Q     Who else?

14         A     My superiors would.

15         Q     What role did they have, say Dan Wallen, Mr.

16    Young?

17         A     If they deemed that they needed to call an

18    electrician or a carpenter or a plumber, they would do

19    that.

20         Q     In addition to you, they also had the

21    authority to assigned overtime to certain individuals?

22         A     Usually on emergency situations.

23         Q     Was all overtime incurred with regard to

24    emergency situations or were there times you just

25    needed to get a job done?

42

                              DOMINICK MORETTI

1

2      A     Yes.  There was planned overtime because of

3  certain divisional operations.   There was emergency

4  overtime.

5            I don't know about mandatory.  What do you

6  mean by mandatory?  I don't know what that means.  If

7  it was an emergency, that was mandatory.

8      Q     That's what I mean.  You call someone in --

9      A     My boss calls me and I start calling the help

10 desk.  Then they start going through the list to see

11 who they can get.

12     Q     With regard to the planned overtime, can you

13 tell me what the general process for assigning planned

14 overtime to someone was?

15     A     My boss would take me out to a job site with

16 the other trades.  We would look at the job and get an

17 idea of what needs to be done.  Then he tells me, when

18 he gets the authorization, he brings back what it

19 costs.  Then he would tell us to go ahead.  He tells me

20 how many men he wants, what materials need to be

21 requisitioned and to prepare for that.

22     Q     When you prepare for it, you make an

23 assessment that you may need X amount of overtime in

24 order to complete the job, correct?

25     A     No.

43

                    DOMINICK MORETTI

1

2      Q    No?

3      A    No.  We access it first to do it on straight

4   time.  We would give that.  Then my superior would come

5   back and say, we'll have to do both ways or we have to

6   do it just on overtime, due to divisional operations.

7      Q    Okay.  If they tell you that you have to do

8   this using some overtime, what would you do at that

9   point?  What was your role?

10     A    I would plan it, get the materials.

11     Q    When planning the overtime, how would you go

12  about doing that?  Would you look at the availability

13  of the men?

14     A    I always ask that every day, whose available.

15  It's not that there is going to be overtime.  We always

16  ask who is available.

17     Q    Then you would assign the overtime, correct?

18     A    Yes.

19     Q    That is different from emergency overtime,

20  correct?

21     A    Yes.

22     Q    In that case you don't have advanced notice

23  of that?

24     A    Of an emergency?

25     Q    Yes.

44

```
1                    DOMINICK MORETTI

2        A    No.

3        Q    You have to look at the list and see who is

4    available and make a call.  What if no one is

5    available?  Would you call someone to come in?

6        A    Well, we have the availability to call an

7    outside vendor to respond.  That was not in the

8    beginning, but it was later on.

9        Q    When was that?

10       A    I don't know.  I think maybe 2003, 2004.

11       Q    Now, did you have the authority to discipline

12   employees?

13       A    Yes.

14       Q    Did you also have the authority to counsel

15   employees and warn them if their performance was not up

16   to par?

17       A    Yes.

18       Q    Do you know Mr. Brian Colella?  I have to ask

19   you that.

20       A    Yes.

21       Q    When was the first time you met Brian

22   Colella?

23       A    I don't know.  It was in the early seventies,

24   I think.

25       Q    You met him in the early seventies?
```

52

                          DOMINICK MORETTI

1

2    like that.

3        Q    Let me see if I can refresh your

4    recollection.  I have two documents.  I'll show you

5    what was marked as Defendant's Exhibits F and G.

6        A    I never saw this.

7             MS. WELCH:  Which one are you referring

8        to?

9             THE WITNESS:  This.

10            MS. WELCH:  Defendant's Exhibit F, okay.

11       Q    You never saw that document.  Were you aware

12   of or does this document refresh your recollection at

13   all as to whether or not Mr. Colella had filed a

14   complaint against you with the Fire Department EEO

15   Office?

16       A    I think they did call me down and they didn't

17   find anything.

18       Q    When they called you down, who called you

19   down, the EEO Office?

20       A    I don't know..  I was called down there a

21   number of times.

22       Q    Back in 2002 what do you recall about being

23   called down and what was discussed?

24       A    When in 2002?

25       Q    It looks like the complaint was filed --

53

1                     DOMINICK MORETTI

2        A     This is 1998 on here.

3        Q     No.  That is just the form.  If you look at

4    the back, the last page is Bates stamped BC05756,

5    7/24/02, date filed.  The complainant, Colella versus

6    Moretti.

7        A     Okay.

8        Q     If you can look at that.  What do you

9    remember about that matter with regard to being called

10   down to the EEO?

11       A     I would have to go back and look at the

12   records from when they called me down there.  I don't

13   have that.

14       Q     Was it standard practice that if an employee

15   filed an EEO complaint, if the complaint was against

16   you, would the EEO contact you just to get your version

17   of the story of what happened?

18       A     Yes, sure.

19       Q     When you were called down by the EUO with

20   regard to Mr. Colella's complaint, you provided them

21   your version of what happened or your defense of his

22   allegations, correct?

23       A     Yes.

24       Q     I'll ask you to take a look at Defendant's

25   Exhibit G.  Have you seen that document before?

54

                        DOMINICK MORETTI

1

2      A    I have never seen this.

3      Q    Were you contacted by the EEO sometime after

4   this was filed in September of 2002?

5      A    I may have been.   They never showed me

6   anything.

7      Q    Did they ask you questions about what he was

8   alleging?

9      A    Yes.

10     Q    You answered those questions?

11     A    Yes.

12     Q    What was your knowledge about what the EEO

13   Office was there for at the Fire Department?

14          MS. WELCH:  Objection to the form.

15     Q    To the extent that you know.

16     A    The same as at Health and Hospitals.

17     Q    Was that to investigate allegations of

18   discrimination or retaliation?

            A    Among other things, like harassment, sexual

     harassment and all the other ones.

            Q    You knew, as a supervisor, that it was

     the law to retaliate against people if they

            selves of the EEO process?

            like to show you a document that I will

60

1                    DOMINICK MORETTI

2       A    Never.

3       Q    Were you aware that Mr. Colella had only

4   accrued thirty-two hours of overtime in 2003, before

5   his termination?

6       A    Well, we'd have to look at the chart to see

7   how many he worked and how many hours he refused.  That

8   would give me a better recollection of that.

9       Q    At any time when you supervised Mr. Colella,

10  had you called him to do overtime when he had indicated

11  that he would not be available?

12      A    Yes.

13      Q    Were there times when you chose not to call

14  him, even though he indicated that he was available?

15      A    Let me explain how it works.  The employees

16  were asked to work overtime, if they were available, in

17  the morning.  When I first went to the Fire Department,

18  equalization of the overtime was the standard.  The

19  only way to control the amount of overtime so no one

20  gets more than the other of all the trades, is to offer

21  it.  When they refused it, it is considered offered.

22           I went above and beyond that.  Even when an

23  employee said they were not available, I verbally made

24  contact with them to reissue the overtime to them, even

25  though they still said they were not available.

61

1                    DOMINICK MORETTI

2          I don't know the Judge's name.  It's in the

3    records.  He said that I went above and beyond my

4    duties, which I really didn't have to.  I still do that

5    with all the employees.

6          Q    A Judge meaning, was there a Federal Case or

7    a State Court Case?

8          A    Maybe she was considered an arbitrator.  I

9    believe that was at 40 Rector Street.  The attorney for

10   Mr. Colella was Fred Richmond, on behalf Local 3.

11         Q    So, with regard to this equalization of

12   overtime policy, the records of overtime would reflect,

13   in other words, if individuals were getting too much

14   overtime, then they had to sort of be put aside and you

15   have to offer the overtime to the individuals that were

16   not getting as much.  Is that accurate?

17         A    No, I wouldn't put it that way.

18         Q    You wouldn't?

19         A    No.  I'll repeat it again and maybe you'll

20   understand it.  Overtime is offered.  So, if I ask you

21   to work tonight and you work seven hours of overtime or

22   three hours.  You said you were available, fine.

23         If I asked another individual and they say

24   they are not available and I asked him first and I have

25   to go to someone else, he gets charged as if he did

62

1                              DOMINICK MORETTI

2        work the overtime.  That's how it worked.

3            Q     Would you, at times, intentionally call Mr.

4        Colella when you knew he was not available and he

5        indicated he was not available for overtime, to offer

6        him overtime, even though there were times he was

7        available?

8                  MS. WELCH:  Objection to the form.

9            A     Mr. Colella had stated to me on a few

10       occasions that he is only available for overtime Monday

11       to Thursday.  He does not want to do Friday, Saturday

12       or Sunday.  I was forced to ask him, because if he was

13       low, he needed to be asked, just like some of the

14       other electricians that needed to be asked.  Everybody

15       was treated the same.  You can see if there are other

16       grid sheets, I guess, up at 9 Metro Tech.

17           Q     We can get to those later this afternoon.

18           A     Okay.

19           Q     Sir, take a look at the arbitrator's

20       decision, Arbitrator Mattye Gandel, with regard to Mr.

21       Brian Colella.

22           A     Okay.

23           Q     Do you recall testifying about this issue of

24       overtime in the matter at 40 Rector Street when you

25       were questioned by Mr. Solotoff?

63

1                        DOMINICK MORETTI

2        A    About overtime?

3        Q    Yes.

4        A    No, I don't recall that.

5        Q    Do you recall testifying about a charge where

6   you testified that you never saw Mr. Colella's inquiry

7   form and the arbitrator finding you not credible

8   because your signature was at the bottom of the form

9   noting that that overtime was not authorized?

10            MS. WELCH:  Objection to the form.

11       A    I'd have to take a look at the document.

12       Q    I'll ask you to take a look at page

13  twenty-six, the first paragraph, three lines down.

14  "Secondly, though Mr. Moretti testified that he never

15  saw the grievance inquiry form, it is clear that he saw

16  the inquiry form dated 2/28/03, because he acknowledged

17  it was his signature at the bottom of the form.  His

18  notation was that overtime was not authorized."

19       A    Yes, that might be true.

20       Q    What was your role with regard to the

21  termination of Mr. Brian Colella back in 2003?

22       A    In regard to what?

23       Q    Did you recommend that charges be brought

24  against him?

25       A    No.

64

```
 1                    DOMINICK MORETTI

 2      Q    How did you find out that Mr. Colella was

 3 terminated?

 4      A    My boss.

 5      Q    You never asked for the termination?

 6      A    No.

 7      Q    Did you bring him on up charges that led to

 8 his termination?

 9      A    I don't know how to say this.  It came from

10 administration.

11      Q    You were responsible for bringing him up on

12 certain charges that you testified about at the

13 hearing?

14      A    Yes.  As I said before, the action went to my

15 boss.  Then we followed the procedure.

16      Q    The arbitrator in this case found that the

17 department "piled on charges against Mr. Colella

18 without attempting to explain the perceived improper

19 behavior in a way in which he could comply with

20 department requirements."

21           MS. WELCH:  What page is that?

22           MS. KOUSOULAS:  Pages thirty-five to

23      thirty-six.

24      Q    Do you agreed with that assessment, that the

25 department, including you, piled on charges against Mr.
```

65

1                           DOMINICK MORETTI

2    Colella without attempting to resort to progressive

3    discipline?

4              MS. WELCH:  You're asking if he agrees

5         with the assessment?

6              MS. KOUSOULAS:  Yes.

7         A    The institution of the charges from the

8    department sounds like it's piled on, but it's not.  To

9    my belief it's not, because it breaks it down

10   specifically.

11             One action can have three or four parts to

12   it.  That's why it may be perceived to be piled on,

13   because that's the way it is in the procedures.

14        Q    In other words, one specific incident could

15   lead to five or six different charges?

16        A    Yes.

17        Q    The arbitrator, if you look at page

18   thirty-nine, in looking at the third paragraph it

19   states, "Finally, unlike Arbitrator Gavin, this

20   arbitrator found the testimony of Mr. Mastropietro and

21   much of the testimony of Mr. Moretti unconvincing,

22   contradictory and evasive."  Do you agree with that?

23        A    No.

24        Q    Ultimately the arbitrator, page forty-four,

25   found that the City wrongfully issued three thirty day

66

DOMINICK MORETTI

1    suspensions and wrongfully discharged Mr. Colella on

2    June 24th, 2003.  Do agree with that conclusion by the

3    arbitrator?

4    A    As an award, I agree with it.

5    Q    Did you believe that Mr. Colella was

6    wrongfully discharged on June 24th, 2003?

7    A    I had to assess that by going through all the

8    the papers.  I didn't have a lot of the papers.

9    Q    You can't say whether the termination was

10   wrongful or not?

11   A    No.

12   Q    Did you believe that the --

13   MS. KOUSOULAS:  Withdrawn.

14   MS. WELCH:  Objection.  Let me ask.  Did

15   you believe that any of the charges that you

16   were responsible for bringing against Mr.

17   Colella, prior to his termination, were

18   wrongfully brought?

19   A    No.

20   Q    When was it that you were told that Mr.

21   Colella had won his arbitration and was coming back to

22   work?

23   A    I don't recall that.

24   Q    Did someone tell you that?

67

```
1                      DOMINICK MORETTI
2        A     Yes, my boss.
3        Q     Was that Mr. Mastropietro?
4        A     I think it was Mr. Wallen.
5        Q     What did he say to you?
6        A     He said Brian Colella is reinstated and he's
7   coming back to work.
8        Q     Did he say it in that tone of voice?
9        A     Yes.
10       Q     Did he seem upset that Mr. Colella was coming
11  back?
12       A     I would imagine he was upset.
13       Q     Why?
14       A     I don't know.  For the things you just asked
15  me prior to that.  Do you think he was wrongfully
16  accused.  I said no.  I wasn't upset he was coming
17  back.
18       Q     Did you respond to Mr. Wallen?
19       A     I said okay, no problem.
20       Q     Did Mr. Mastropietro maintain a hit list of
21  employees that were considered to be troublemakers?
22             MS. WELCH:  Objection to the form.
23       A     I don't know about that.
24       Q     Did you believe that Mr. Colella was a
25  troublemaker?
```

98
1                    DOMINICK MORETTI

2        Q     I'll show you a document that was produced by

3    your attorney.

4              MS. KOUSOULAS:  I'd like to have this

5        marked as Plaintiff's Exhibit 8.

6              (Whereupon, a CHARMS report was marked as

7        Plaintiff's Exhibit 8 for identification, as

8        of this date.)

9        Q     Can you tell me if you know what this

10   document is?

11       A     No.

12       Q     Have you ever heard the term CHARMS report?

13       A     Yes, you mentioned that before.

14       Q     You have never heard of that before?

15       A     No.

16       Q     Can you take a look at the list of names on

17   the left side of the document.  Are those employees who

18   were electricians under your supervision?

19       A     Yes.

20             MS. WELCH:  Take a look at every page.

21             MS. KOUSOULAS:  For the record, these

22       CHARMS reports were printed out on December

23       20th, 2010, but they are for the years 2007,

24       2008, 2009 and part of 2010.

25       A     Okay.

99

1                    DOMINICK MORETTI

2        Q    Now, Steven Lalino seems to have the least

3   amount of overtime.  Had Mr. Lalino indicated to you

4   that he would not be available for overtime?

5        A    Yes.

6             MS. WELCH:  Objection.  What year are

7        you referring to?

8             MS. KOUSOULAS:  Just the first page.

9        Q    In 2007.

10       A    Yes.

11       Q    So he seldom worked overtime, correct?  That

12   was of his own choice.

13       A    It was not seldom.  It was more than seldom,

14   yes.

15       Q    That was his own choice?

16       A    Yes.  We offered it to him, but he refused it.

17       Q    Now looking at 2008.

18       A    Yes.

19       Q    John Fabbricatne had fifteen hours of

20   overtime.  Do you know whether he left the City's

21   employ back in 2008?

22       A    I would have to look at the records.

23       Q    You mentioned before that there was a policy

24   of equalization of overtime, correct?

25       A    Yes.

100

DOMINICK MORETTI

1

2      Q      Was that a policy that was in place the

3   entire time that you were a supervisor of electricians

4   at the Fire Department?

5      A      I may have said that, yes.

6      Q      I'd like to show you a series of documents

7   that I'll have marked as Plaintiff's Exhibit 9.

8          (Whereupon, an FDNY memo was marked as

9          Plaintiff's Exhibit 9 for identification, as

10          of this date.)

11          MS. KOUSOULAS:  For the record, this is

12          a collection of documents.  The witness can

13          indicate whether he has seen some of them or

14          not.  I'll ask questions about them.  I'll

15          collectively mark them as one Exhibit.

16          The first is a memorandum in 1999 from

17          Mr. Mastropietro regarding overtime

18          equalization.

19          The second, page P00157, is the directive

20          to all heads of agencies regarding overtime

21          reporting and monitoring.  It's a three page

22          document signed by Rudolph Giuliani, Mayor.

23          The third document is a memo from Mr.

24          Mastropietro regarding overtime.

25          THE WITNESS:  On 160.

110

DOMINICK MORETTI

1

2      A      I put it on my return.  I had no reason to

3  question that.

4      Q      I'm not asking you about the substance of

5  what he was saying.  I'm asking you about your

6  knowledge of what he was complaining about?

7      A      No, I don't.

8      Q      You never knew that he complained that some

9  of the Russian born electricians, their W-2 statements

10  were different from the other W-2 statements?

11      A      No, I had no knowledge of that.

12      Q      Had you ever seen a copy of what was marked

13  as Defendant's Exhibit H before?

14      A      That, no.

15      Q      No one from the EEO Office at the Fire

16  Department contacted you with regard to this issue?

17      A      Not that I'm aware of, no.

18      Q      Did anyone from the FDNY EEO Office ask to

19  see your W-2 to see if what Mr. Colella was saying was

20  accurate?

21      A      Ask to see my W-2s?

22      Q      Yes.

23      A      No.

24      Q      Between March of 2007 and February of 2008,

25  did anyone from the EEO Office contact you with regard

```
                        DOMINICK MORETTI
1
2    to allegations that were being made by Mr. Colella?
3         A    I believe there were some.
4         Q    You were aware that Mr. Colella was making
5    some type of EEO allegations?  Whether you agreed with
6    them or not was a different issue.
7         A    They didn't tell me what it was.  They just
8    may have asked me some questions.
9         Q    Do you know whether or not you were
10   questioned about that fringe benefit issue?
11        A    No.
12             MS. KOUSOULAS:  Can I have this marked
13        as Plaintiff's Exhibit 10.
14             (Whereupon, an FDNY Facility Management
15        document was marked as Plaintiff's Exhibit 10
16        for identification, as of this date.)
17        Q    Plaintiff's Exhibit 10, sir, do you recognize
18   this document?
19        A    No.
20        Q    Do you recognize the names on the document?
21        A    Yes.
22        Q    Other than yourself, who are the rest of the
23   individuals?  Are they electricians?
24        A    Yes, electricians.
25        Q    Where it states vehicle number, what does
```

123

DOMINICK MORETTI

1

2     Q    You were just aware of the internal EEO

3  Complaint?

4     A    Yes, exactly.

5     Q    Now, when you say you were not aware of the

6  Federal EEOC Complaint, are you saying that you don't

7  recall, as you sit here now, whether that was

8  specifically something that was raised with them or

9  you're saying you were never told about that?

10     A    As far as I knew, any EEO complaint was

11  within the department.  I didn't know it went to the

12  outside.  Whatever information they asked me for, I

13  provided them with.

14     Q    Sir, do you have any independent

15  recollection, as you sit here today, about a

16  supervisory conference that you held with Mr. Colella

17  back in April of 2007, shortly after he returned to

18  work?

19     A    I'd have look at the records.

20         MS. KOUSOULAS:  Plaintiff's Exhibit 13,

21     please.

22         (Whereupon, an FDNY supervisory

23     conference document was marked as Plaintiff's

24     Exhibit 13 for identification, as of this

25     date.)

127

DOMINICK MORETTI

1

2      Q     Was he indicating whether he was available

3  for overtime on a consistent basis?

4      A     We had to ask him.  Even then, though he

5  always said no.

6      Q     So he never indicated whether he was

7  available for overtime?

8      A     I would ask him every day and he said no.

9  When we had the overtime, we asked him anyway.  You can

10  check his hours.  He refused.

11      Q     With regard to Mr. Colella, he was also

12  charged with not filling out those weekly time reports,

13  correct?

14      A     That's correct.

15      Q     What do you mean by not filling them out?

16  What was he doing that was objectionable to you?

17      A     The time sheets came in for the days he was

18  reporting working overtime.  It was not authorized.  It

19  was not on the sheet when it came in.  We found out

20  when he faxed it in at the end of the week or on

21  Monday.

22      Q     That he was working overtime that was not

23  authorized?

24      A     Correct.

25      Q     To your knowledge was Mr. Lalino ever

128

DOMINICK MORETTI

1    brought up on charges or disciplined for not filling

2    out his weekly time report accurately while you were

3    there?

4    A    Not that I know of.

5    Q    As far as you know, Mr. Lalino never filed

6    any EEO complaints against you or against any of his

7    supervisors, correct?

8    A    I don't know.

9    Q    You don't have any knowledge of that?

10    A    No.

11    Q    Let me show you what I'll have marked as

12    Plaintiff's Exhibit 15.

13         (Whereupon, a weekly time report was

14         marked as Plaintiff's Exhibit 15 for

15         identification, as of this date.)

16    Q    Sir, is this a weekly time report that is

17    filled out by the electricians?

18    A    Yes.

19    Q    This is for the week ending 9/20/08 and

20    that's by Mr. Lalino, correct?

21    A    Yes.

22    Q    In that, Mr. Lalino doesn't indicate whether

23    he is available for overtime on Sunday and Saturday of

24    that week, correct?

25    that week, correct?

129

                        DOMINICK MORETTI

1

2        A    Yes.

3        Q    He should have done that?  He should have

4   indicated yes or no?

5        A    Yes, with an explanation.

6        Q    In terms of time in and time out, Mr. Lalino

7   wrote eight ten to two o'clock for Monday the 15th.  He

8   has eight twenty-five to two o'clock for the 16th.  He

9   has eight twenty to two o'clock for the 17th.  Then,

10  with the regular hours he writes seven, seven, seven

11  and seven.  Does eight ten to two o'clock equal seven

12  hours, sir?

13       A    Yes, it does.

14       Q    Wasn't he supposed to come in at seven-thirty

15  in the morning or call in at seven-thirty in the

16  morning?

17       A    He was downstairs at 58th Street.  That's his

18  first stop.  He made contact there.

19       Q    Where does it indicate anywhere on this time

20  sheet that he reported and made contact at seven-thirty

21  in the morning?

22       A    It doesn't indicate it.

23       Q    That is wrong.  He should have written the

24  time he reported to work, unless he was late, right?

25       A    Well, you can say that.  You can say it was a

130

DOMINICK MORETTI

1   given.  He was always there.

2          MS. WELCH:  A note for the record: this

3      time sheet is not signed by a supervisor.

4      So I don't understand.

5          MS. KOUSOULAS:  I can go through this.

6          MS. WELCH:  There is no Bates stamp and

7      that's why I'm wondering.

8          MS. KOUSOULAS:  I'm just asking

9      questions.  It has nothing to do with it.

10     It's Mr. Lalino's.  I'm just trying to make

11     sense of how the time sheets needed to be

12     filled out.

13     Q    With regard to two o'clock, the time out,

14 is that because, typically, all the electricians

15 signed out at two o'clock to get back home by three

16 o'clock?

17     A    They have an hour to get from the job site

18 back to 58th Street.

19     Q    So, even if you had eight ten until

20 three o'clock, that wouldn't be seven hours?

21     A    No.  He put his actual work hours, meaning

22 physically, not with the travel time.

23     Q    So, if you were looking at this, sir, would

24 you have given this back to Mr. Lalino to tell him to

```
1                     DOMINICK MORETTI

2   correct that?  It's confusing, would you agree?

3       A    You know, sometimes you have certain

4   individuals that have their own agenda.  The agenda

5   sometimes, we tell them many times, like we have

6   told other electricians.  They got into this thing

7   when they first started with the Fire Department.

8   Maybe that's the way they did it.  That form changed

9   a few times.

10      Q    Other than Mr. Colella, did you bring any

11  other electricians under your supervision under formal

12  charges for not properly preparing their weekly time

13  report?

14      A    We'd have to bring the charges and then bring

15  the instances.  Then I think that would be self

16  explanatory.

17           When it came to writing down overtime that

18  was unauthorized and we didn't see it on a daily basis,

19  then you get it in at the end of the week with certain

20  days that have overtime that wasn't authorized.  We had

21  to refuse the authorization of that overtime.

22           MS. WELCH:  Off the record.

23           (Whereupon, a discussion was held off

24      the record.)

25           MS. WELCH:  Can you rephrase the
```

132

                              DOMINICK MORETTI
1
2          question for Mr. Moretti.  I'm not sure he
3          understood it.
4          Q     I know counsel conferred with you.  Is there
5     something that you didn't understand about the
6     question?
7          A     There were other employees, when I first had
8     gotten there, that were doing the same thing.
9          Q     This is in 2008.  This is seven years into
10    your tenure.  How many times was Mr. Lalino written up
11    or brought up on charges?
12         A     I don't remember.  I don't believe ever.
13         Q     Was any other employee served with charges,
14    actual formal charges, disciplinary charges, for not
15    accurately reporting a time sheet, other than Mr.
16    Colella?
17         A     I need to know what the charges were for.  If
18    you're saying to me --
19         Q     I'll specifically ask you about that.  Other
20    than Mr. Colella, was any electrician under your
21    supervision brought up on formal charges for failing to
22    indicate when he was available for overtime?
23         A     I have to go into the records.  I don't
24    remember.
25              MS. KOUSOULAS:  I'm going call for